1

2

3

4

5        UNITED STATES DISTRICT COURT

6        NORTHERN DISTRICT OF CALIFORNIA

7

8   JEFFREY LEE DUVARDO,                     No. C 05-5428 MHP (pr)

9           Petitioner,                      **ORDER DENYING HABEAS
                                             PETITION**
10          v.

11  GEORGE GIURBINO, warden,

12          Respondent.
    _____/
13

14                          **INTRODUCTION**

15          Petitioner Jeffrey Duvardo filed this pro se action seeking a writ of habeas corpus

16  under 28 U.S.C. § 2254.  The matter is now before the court for consideration of the merits

17  of the amended petition.  For the reasons discussed below, the amended petition will be

18  denied.

19                          **BACKGROUND**

20  A.      The Crimes

21          Petitioner challenges his conviction for murdering his parents.  The California Court

22  of Appeal gave a very lengthy description of the circumstantial evidence, Cal. Ct. App.

23  Opinion, pp. 1-19, which this court only summarizes briefly here, although much of the

24  evidence is discussed later as it relates to the various claims asserted by Petitioner.

25          Petitioner lived in the city of Valencia, north of Los Angeles.  His parents, Mary Ann

26  and Donald Duvardo, lived in the town of Nice in Lake County, California.  (First names are

27  used for clarity because many of the people involved have the same last name.)  Mary Ann

28  and Donald were murdered in their home.  Donald had been stabbed about 15 times in the

chest.  Mary Ann had been stabbed and slashed several times, had her carotid artery or jugular vein slit, and had been hit in the eye.  Their bodies were discovered on April 6, 1999.  The prosecution theorized that, on March 31, 1999, the 43-year old Petitioner drove from Valencia to Nice, killed his parents, and drove home the same day.  The prosecution theorized that Petitioner killed his parents to avoid repaying a $30,000 loan from them and to keep secret from his second wife the fact that the loan existed and the fact that he was still married to his first wife.  The prosecution presented evidence regarding Petitioner's motive, opportunity, and financial difficulties.  Petitioner presented an alibi defense that he was at work in Southern California when his parents were killed in Lake County, and contended that the victims could not have been killed on the date the prosecution theorized because their bodies were not sufficiently decomposed when found six days thereafter.

B.   Procedural History

Following a jury trial in Lake County, Petitioner was convicted of two counts of first degree murder and two counts of elder abuse.  See Cal. Penal Code §§ 187, 368(b)(1).  The jury found true the multiple murder special circumstance allegation.  See Cal. Penal Code § 190.2(a)(3).  Although the district attorney had earlier announced his intention to seek the death penalty, that was dropped after the guilty verdicts were returned.  On May 16, 2002, the court sentenced Petitioner to two concurrent terms of life imprisonment without the possibility of parole for the murders and stayed the sentences for the elder abuse convictions.

Petitioner appealed.  The California Court of Appeal affirmed the conviction and the California Supreme Court denied the petition for review.  Petitioner filed unsuccessful state habeas petitions.

Petitioner then filed this action, seeking a writ of habeas corpus.  The case was stayed while Petitioner exhausted state court remedies as to some claims.  After exhausting state court remedies, Petitioner filed an amended petition that had seven claims: (1) Petitioner's right to due process was violated because the evidence was insufficient to support the verdicts, (2) his right to due process was violated by the admission of "victimology" expert

opinion evidence, (3) his right to due process was violated by the admission of impermissible character evidence, (4) his rights to effective assistance of counsel and due process were violated by counsel's failure to submit critical items of evidence to proper forensic testing and/or examination, (5) his right to due process was violated by the exclusion of evidence about cars seen near the victims' home, (6) cumulative error, and (7) his rights to due process and effective assistance of appellate counsel were violated by appellate counsel's failure to raise critical issues in the original appeal.  The court found the federal constitutional claims to be cognizable and issued an order to show cause why the petition should not be granted. Respondent filed an answer and Petitioner filed a traverse.  The matter is now ready for a decision on the merits of the amended petition.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Lake County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims in the amended petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that

1  was contrary to, or involved an unreasonable application of, clearly established Federal law,

2  as determined by the Supreme Court of the United States; or (2) resulted in a decision that

3  was based on an unreasonable determination of the facts in light of the evidence presented in

4  the State court proceeding."  28 U.S.C. § 2254(d).

5      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

6  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

7  law or if the state court decides a case differently than [the] Court has on a set of materially

8  indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

9      "Under the 'unreasonable application' clause, a federal habeas court may grant the

10  writ if the state court identifies the correct governing legal principle from [the] Court's

11  decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at

12  413.  "[A] federal habeas court may not issue the writ simply because that court concludes in

13  its independent judgment that the relevant state-court decision applied clearly established

14  federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

15  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

16  whether the state court's application of clearly established federal law was "objectively

17  unreasonable."  Id. at 409.

18                                    **DISCUSSION**

19  A.      Sufficiency Of The Evidence

20      Petitioner contends that there was insufficient evidence to support the murder

21  convictions.  Specifically, he challenges the adequacy of the proof that he was the person

22  who murdered his parents and that the killings occurred on March 31, 1999.  The date of

23  death was critical because that March 31 was the only day on which the prosecution tried to

24  show he had time to make the trip to the site of the murders.

25      The California Court of Appeal rejected the insufficient evidence claim:

26      The various threads of circumstantial evidence combine to make a quilted pattern of
        guilt. Viewed in the light most favorable to the judgment, the evidence shows the
27      Duvardos were killed on the morning of March 31–and it was defendant who killed
        them.

28

                                          4

The Duvardos were last seen March 30. From about 7:00 on the morning of March 31, they did not answer their phone, use their e-mail, or follow their habit of picking up their mail and newspapers each day at 11:30 a.m. On the last morning of their lives they had had their coffee, but had not yet cleaned the coffeepot. The clock in the bedroom had fallen to the floor when the home was ransacked and had stopped at 10:25. The medical evidence of time of death was inconclusive, but consistent with the People's theory of the case–that, as Safarik opined, the Duvardos were killed sometime on March 31 between 7:30 and 10:20 or 10:25 a.m.

No signs of forced entry were found, meaning the Duvardos knew their assailant and let him in their home. Two experienced law enforcement officers, a detective and an FBI expert in crime scene reconstruction, believed the crime scene was staged. The expert opined the staging was done because the killer would be an obvious suspect and wanted to divert the attention of the investigation to a hypothetical anonymous burglar.

Defendant was an early riser, accustomed to getting up at 3:45 or 4:00 a.m. He had sufficient time to rise, drive the six or so hours to his parents['] house, kill them at 10:20 or 10:25 a.m., and drive back to southern California–where he placed a call from his home phone at 6:26 p.m. On March 31 he already had the rental car, which he had secured the day before–when he had rented the car for two days while putting his own car in the shop for two hours' work. He put 1,128 miles on the rental car, which was roughly equivalent to the round trip between the rental agency and his parents' house. Defendant knew that Wednesday, March 31, he would not have his typical visitation with his daughter Nicole. He presumably also knew his wife would have a business meeting after work and would not be home until late.

Although defendant claimed he had not visited his parents for a year, his blood was on a wadded up towel in the master bathroom–but the towel belonged in the kitchen. The towel, which had air dried, was lying in the sink–in the home of a meticulous housekeeper who would have put the towel in the laundry bin. This leads to the reasonable inference defendant was recently in the house and had cut himself during the vicious attacks and left the towel behind. 7/

>       [footnote 7:] We are aware that defendant contradicted himself and claimed to
>       have visited his parents early in 1999. That still does not explain why a tidy
>       housekeeper would leave a wadded up kitchen towel, stained with blood, in the
>       sink of her master bathroom.

Defendant could not substantiate his claim that he was working in Southern California when his parents were killed. He showed an interest in the sign-in sheets for March 31 and could have signed them after the fact. As we noted above, there is a conflict in the evidence whether a signature on a sign-in sheet necessarily means the signer was physically present at the meeting.

Defendant had the financial motive to kill his parents. He had a checkered financial history, always seemed to need large amounts of money, and owed his parents at least $30,000. Soon after their deaths he applied for life insurance benefits.

Defendant also appeared to be highly emotional and unstable. Several people saw him pretend to cry but shed no tears. He told suspicious stories. He claimed at various times to have cancer, to have been exposed to Agent Orange, and to be a covert gunrunner for the CIA, selling arms to foreign governments in exchange for gold, gems, and securities. This evidence bearing on his financial background and his reaction when discussing the murders of his parents, also went to his credibility.

1    The evidence is sufficient to support the murder convictions.

2  Cal. Ct. App. Opinion, pp. 20-22.

3    The "Due Process Clause protects the accused against conviction except upon proof

4  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5  charged." In re Winship, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a

6  state court conviction does not determine whether it is satisfied that the evidence established

7  guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence

8  in the light most favorable to the prosecution, any rational trier of fact could have found the

9  essential elements of the crime beyond a reasonable doubt.'" Jackson v. Virginia, 443 U.S.

10  307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a

11  reasonable doubt may the writ be granted. Id. at 324. The "prosecution need not

12  affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court

13  "'faced with a record of historical facts that supports conflicting inferences must presume –

14  even if it does not affirmatively appear in the record – that the trier of fact resolved any such

15  conflicts in favor of the prosecution, and must defer to that resolution.'" Wright v. West, 505

16  U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326). The Ninth Circuit has

17  explained that "[c]ircumstantial evidence and inferences drawn from it may be sufficient to

18  sustain a conviction. . . . Nevertheless, 'mere suspicion or speculation cannot be the basis for

19  creation of logical inferences.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).[1] A

20  federal habeas court applies the standards of Jackson with an additional layer of deference

21  under the AEDPA, generally asking whether the state court's decision reflected an

22  unreasonable application of Jackson and Winship to the facts of the case. Juan H. v. Allen,

23  408 F.3d 1262, 1274-75 (9th Cir. 2005), cert. denied, 546 U.S. 1137 (2006).

24    The California Court of Appeal's decision was not contrary to or an unreasonable

25  application of clearly established federal law. The state court used the applicable federal

26  standard, even if it did not mention Jackson or any other specific federal case, and reasonably

27  rejected the claim. See Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (not necessary to

28  cite Supreme Court cases for § 2254(d) to apply).

Viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences therefrom in the prosecution's favor, a rational jury could have found that Petitioner was the killer and the killings occurred on March 31, 1999.   Bearing in mind that it "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts," Walters, 45 F.3d at 1358, the court discusses the evidentiary highlights of this long trial.

Blood On The Towel:  Evidence of Petitioner's blood on a kitchen towel found in the master bathroom sink was highly incriminating under the circumstances.  There was virtually no contest that the DNA testing showed Petitioner to be the source of the blood, and ruled out his parents and brother as the source of that blood.  The question thus was not whether the blood was his, but rather was when was it put on the towel?  On that point, the evidence and reasonable inferences were catastrophic for Petitioner.  It had been about ten months since he had last been in the home before the killings.  The stain was noteworthy in size, as it looked to be "approximately a half an inch wide by an inch – approximately an inch and a quarter long."  RT 2043.  While the towel certainly was not dripping with blood, a blood stain of that size on a kitchen towel belies Petitioner's assertion that it was "tiny" and could have been missed by Mary Ann.  Appellant's Reply Brief, p. 8.  Also, the towel had not been laundered since the blood was deposited.  This could be inferred from the uncontradicted testimony of an evidence technician that he was unaware of any DNA test that could have been performed successfully for DNA after detergent had been used on the blood.  Further, the stained towel was wadded or balled up in the master bathroom sink bowl, making it reasonable to infer that the master bathroom sink had not been used since the towel was put there.  This evidence about the DNA, the size of the bloodstain, the towel's condition and the towel's location allowed the jury to infer that this was a new blood stain on a towel that was put in the sink very recently.  A rational trier of fact could have concluded that the stain was left on the towel by the killer.  Petitioner had been in the house not more recently than ten months before the killings and told his siblings that he had haircuts and nosebleeds there over the years, but that evidence was not such as to prevent a reasonable jury from rationally

concluding that Petitioner deposited that blood stain the day he was in the house killing his parents.

Petitioner urges that his case is a DNA-only case and should be viewed like a fingerprint-only case, such as Mikes v. Borg, 947 F.2d 353 (9th Cir. 1991), cert. denied, 505 U.S. 1229 (1992), in which the court addressed a situation where the only evidence linking a defendant to a crime scene or murder weapon was a fingerprint.  The problem with Petitioner's fingerprint-only analogy is that this is not a DNA-only kind of case.  There was independent circumstantial evidence connecting Petitioner to the crime scene on the day of the killing, such as the excessive mileage on his rental car, his financial and marital secrecy motives to kill these particular people, and the evidence suggesting that the victims knew their killer.  See Bean v. Calderon, 163 F.3d 1073, 1087 (9th Cir. 1998), cert. denied, 528 U.S. 922 (1999) (Mikes rule did not apply because fingerprint evidence was supplemented with other circumstantial evidence of guilt).  Petitioner was a suspect months before the DNA results came back, although he was not arrested until the DNA test results identified him as the donor of the blood.  Further, the fingerprint-only analogy is particularly inapt where the defendant is not a stranger to the victim or crime scene: family members' fingerprints would not be unexpected in a family home.

Even if this was considered a DNA-only case, Petitioner's argument that Mikes governs would fail.  In Mikes, the Ninth Circuit explained how certain fingerprint evidence should be viewed:

> [I]n a case in which the prosecution's theory is that the defendant's fingerprints were placed on the murder weapon at the time of the commission of the crime or were left at the scene of the crime during its commission, the record must show that the object was inaccessible to the defendant or that the defendant did not have access to the crime scene, during the relevant period prior to the crime's commission.

Mikes, 947 F.2d at 361.  The Mikes case had facts that are distinguishable from Petitioner's case, and those facts lead to a different outcome for Petitioner.  In Mikes, the victim was killed with a metal post from a disassembled turnstile which the victim had bought four months earlier at a hardware store's going-out-of-business sale.  The victim had stored the

turnstile posts in his private basement.  Mikes' fingerprints were on the post, but nowhere else at the crime scene.  The fingerprints were the only evidence linking Mikes to the crime scene.  Those prints were not enough, concluded the Ninth Circuit, because the posts were accessible and very likely to have been touched by the general public in the store before the victim bought the posts, there was testimony that the prints could last indefinitely on the posts, and Mikes' fingerprints were not identified elsewhere at the crime scene.  Petitioner's case differed in a few key respects from that in <u>Mikes</u>: The evidence was blood, not fingerprints, and blood by its very nature is not deposited with the ease of fingerprints (i.e., fingerprints are left on almost every surface a person touches while blood is not routinely left behind and usually connotes a trauma of some sort has happened to the depositor).  Petitioner's blood was left on an object that would not be expected to be left in the condition it was in or in the place it was in for any considerable amount of time.  People do not generally leave towels in the sink while using the sink and one would not expect a tidy housekeeper not to deal with a noticeable bloodstain on a towel.

    Contrary to Petitioner's assumption, <u>Mikes</u> does not lay down a blanket rule that a defendant can never be convicted in a fingerprint-only case.  The Ninth Circuit recognized that <u>Mikes</u> does not cover all fingerprint-only cases in <u>Taylor v. Stainer</u>, 31 F.3d 907 (9th Cir. 1994).  There, a fingerprint was found on the bottom edge of the victim's window sill.  The <u>Taylor</u> court distinguished <u>Mikes</u> on the facts:

> The turnstile and the posts in <u>Mikes</u> had been in a store -- a public place where anyone could have had access to them.  The inside of [the victim's] windowsill was not in a public place, and Taylor would not have had access to it absent some unusual circumstance.  Moreover, the print was found precisely at the point of entry for this burglary-murder, and the location of the print under the sill strongly suggests it was left by someone crawling through the window.  Thus, <u>Mikes</u> does not control here.  To hold that the evidence against Taylor was insufficient, we would have to extend <u>Mikes</u> to cover fingerprints that are found in places or on objects that were never accessible to the general public and that can be explained in a manner consistent with innocence only through far-fetched, unsupported speculation.  This we decline to do.

<u>Taylor</u>, 31 F.3d at 909-10.  If the fingerprint-only line of cases applied, Petitioner's case would be more similar to <u>Taylor</u> than to <u>Mikes</u> because of the place and nature of a visible blood stain on a towel in the sink bowl of a bathroom in use by a tidy housekeeper strongly

suggested it had not been there very long at all.  In light of the evidence that Petitioner had not been in his parents' home for about ten months, the presence of his blood on that towel could be "explained in a manner consistent with innocence only through far-fetched, unsupported speculation," id. at 910.  And, as noted earlier, the rationale for the fingerprint-only line of cases does not fit well with a situation in which a person has an established connection with the site at which the evidence is deposited.

The DNA evidence was, as mentioned, key to the prosecution.  Petitioner had not recently visited the house.  He told police he had been there about a year earlier, perhaps the Memorial Day weekend the year before the murders took place.  He later told police he had been there within the year, but provided no specifics as to when those visits occurred and presented no evidence showing any such visits.  When the police asked for hair and blood samples, Petitioner told his brother and sister that he had nose bleeds and hair cuts at the house in the past – statements that under the circumstances seemed more reflective of a guilty conscience than a credible explanation for the blood's presence.  The evidence presented certainly permitted a rational jury to conclude that he had not been at the house for more than ten months before the killings and that his blood got on the towel on the day he killed his parents.

Time Of Death - Signs Of Life Activity:  Time of death is not an element of the crime, but was key here because March 31 was the only date as to which the prosecutor tried to show that Petitioner travelled to Nice, and there was evidence that he was back at home in Valencia by 6:26 p.m. that night to make a telephone call.  The time of death evidence included a lot of evidence about the signs of life activity in the household as of March 31 and evidence about the condition of the bodies.

Evidence showed that there was no activity in the household after the morning of March 31 until the bodies were discovered on April 6.  Neighbor Joseph Burke saw Donald on March 30.  There was no evidence that anyone saw Donald or Mary Ann alive thereafter.  Mail that accumulated in the couple's post office box included the March 31 newspaper as well as newspapers for the following days.  There were messages on their answering machine

from and after March 30.  Telephone calls made to them on and after March 31 were not answered.  Records showed that in the days before their death, there were regular phone calls, store purchases and other financial activity.  There was no evidence they had left town for a trip, although Petitioner urges that could explain the absence of activity after March 31. The couple's internet account had last been accessed at about 7:05 a.m. on March 31.  There was a small amount of mold in one of the coffee mugs and in the coffee pot.  The clocks in the house were an hour behind the correct time, and daylight savings time had begun on April 4. The evidence that supported an inference that they were killed on the *morning* of March 31 included the absence of activity after the 7:05 a.m. internet access, the uncleaned coffee mugs and pot, and a clock that had fallen had stopped at 10:25.  Also, the unclaimed newspaper for March 31 suggested their lives had ended that morning as they habitually went to the post office in the late morning to retrieve their mail.

Time Of Death - Condition Of The Bodies:  Neither of the pathologists who testified could pinpoint the time of death, although they agreed the bodies were in the early stages of decomposition.   Dr. Gill, a forensic pathologist who did the autopsies on the victims, could not determine the time of death, other than to say it had occurred in "an interval of days."  RT 2677.  Defense forensic pathologist Dr. Lawrence opined that the victims had been dead 3-4 days, give or take a day, at the time their bodies were discovered.  Factors including ambient temperature, humidity, and insect activity affect the rate of decomposition.  The greater the passage of time, the more difficult it is to determine the time of death.  Dr. Lawrence stated that where the body is decomposed, it is often best to determine time of death from other evidence, "such as when the lights are on or off, when the mail was picked up, what newspapers are on the porch and so forth.  It's very important when the person was last seen alive."  RT 2979.  He had not done any of that kind of investigation and gave his opinion that the victims had been dead 3-4 days, give or take a day, based his the condition of the bodies as photographed and described, an ambient temperature of 74 degrees (based on the thermostat setting), and information that no one first on the scene smelled any unusual odor. He thought it was very unlikely that the bodies had been there for 6-7 days.

11

The pathologists agreed that the warmer the ambient temperature, the faster the decomposition. However, the evidence on ambient temperature near the bodies was equivocal. Several people described the house as uncomfortably warm on April 6 and the thermostat was set at 74 degrees. However, Donald's body was found in a laundry room, which may have been colder than other parts of the house because the laundry room was between the living room and the garage, and there was a heavy self-closing door separating the laundry room from the living room. Mary Ann's body was found on the floor near the front door and a wood stove that may have had a draft. The bodies were both at the same stage of early decomposition. If they were in an ambient temperature cooler than 74 degrees, such as 60-65 degrees, the decomposition would be slower, the absence of reports of malodor would have not been surprising, and the estimates of days since death would have been affected. For example, Dr. Lawrence stated that if the temperature was 60 or 65 degrees, the victims could have been dead for 6-7 days when found.

The defense made much of the fact that one law enforcement officer noted rigor mortis, but the evidence on rigor mortis did not undermine the prosecution's case that the murders occurred on March 31. Sergeant McMahon stated he felt rigor mortis when he touched the back of Mary Ann's neck for a pulse. However, other police at the scene, including detective Paulich who helped later to move the bodies did not observe rigor mortis. Rigor mortis was described as the rigidity of the body that develops over time after a person dies, RT 2762, involving chemical changes in the skeletal muscles and voluntary muscles used to move body parts. RT 2767. If a body is in full rigor mortis, the limbs are locked in place and there is a resistance to movement such that the limbs cannot be moved generally while in rigor. RT 2768. Dr. Gill testified that rigor mortis reaches a maximum at about 8-12 hours after death and is gone at about 36 hours after death, plus or minus as much as 12 hours. RT 2762, 2765. Dr. Lawrence testified that rigor reaches a maximum in 5-6 hours and then starts disappearing at 24 to 36 hours. RT 2975. Ambient temperature and the decedent's physical activity preceding death can affect the length of this process. RT 2762. Neither pathologist testified that rigor mortis would be observed in the back of a person's

1   neck.  Dr. Lawrence explained that sometimes the decomposition process could produce an

2   effect of subcutaneous gas that could seem to be stiffening of the body and that the person

3   who observed rigor could have been mistaken.

4          The condition of the bodies was a difficult issue for the prosecution, as neither was

5   beyond the early stages of decomposition and none of the people that entered the home on

6   April 6 described a pronounced malodor.  Some officers detected no odor, while a criminalist

7   detected the odor of decomposition when he first entered the residence.  Some of the blood

8   under Mary Ann's body was still liquid: the large pool of blood on the carpet under her was

9   somewhat dried on top and wet underneath, and the blood on her sweatshirt was still partially

10  wet.  The evidence was not such as to show that it was irrational to conclude that the victims

11  were killed on March 31.

12         Opportunity/Alibi Evidence:  The prosecutor presented evidence to try to prove that

13  petitioner had the opportunity to and did travel to Nice to commit the crime on March 31.

14  The defense countered with an alibi defense.  The way an alibi fits into the reasonable doubt

15  picture is that it need only raise a reasonable doubt that the defendant was not present at the

16  scene of the crime.  See People v. Costello, 21 Cal.2d 760, 766 (Cal. 1943); CALJIC 4.50

17  ("If, after a consideration of all the evidence, you have a reasonable doubt that the defendant

18  was present at the time the crime was committed, you must find him not guilty."); Ninth Cir.

19  Model Crim. Jury Instr. No. 6.3 (substantially the same as CALJIC 4.50).   So the question

20  here was whether Petitioner's evidence that he was at work at a Boeing plant in Long Beach

21  raised a reasonable doubt that he was in his parents' house on March 31.

22         The prosecutor presented evidence that Petitioner put enough mileage on a rental car

23  to make the trip.  He rented a car in Long Beach on March 30, and put 1,128 miles on it in

24  two days before returning it April 1.  The round-trip distance from the car rental agency to

25  the victims' home via Duvardo's home was 1,046 miles.  The defense presented evidence

26  questioning the accuracy and reliability of the car rental agency's record-keeping.  A

27  detective who drove the route determined that it took about 6 hours and 45 minutes to travel

28  from the victims' home in Nice to Petitioner's home in Valencia.  (The additional time to

travel from Petitioner's home to the car rental agency did not matter because the theory was that Petitioner woke up early, drove from his home to Nice, killed his parents, and returned home before 6:26 p.m.  The prosecutor therefore only needed to show the amount of time to travel between Valencia and Nice and make allowance for time to commit the crimes and ransack the house.)  Petitioner's own car was in a shop for repairs on these days; the evidence was disputed when certain additional repairs were authorized.

The defense presented evidence that Petitioner had been at work at a Boeing plant in Long Beach on March 31 and had signed attendance sign-in sheets for two meetings that day.  His was one of about 30 signatures on one sign-in sheet; no one had a specific recollection of him being at the meeting but some witnesses believed he would have been there if he signed the sheet.[2]  The prosecution countered with evidence that showed it was possible for Petitioner to gain access to and sign the sign-in sheets days after the meetings, although there was no evidence that anyone saw him sign the sheets after-the-fact.  The prosecution presented evidence that Petitioner had not used his employee scan pass to access various facilities at Boeing on March 31, but the defense countered with evidence that the scanning points could be and often were bypassed by workers.  There was evidence that Petitioner had not accessed his computer files on March 31 and could have been absent from the office without being noticed for a day or two.  There were also other days on which he had not had computer activity.

There was evidence that Petitioner did not use his cell phone on March 31, and did not access his ATM that day.

Other Evidence:  In addition to the blood on the towel that pointed to Petitioner specifically, the evidence that suggested the killer was someone known to the victims and perceived as a friend rather than a foe included the following: there were no signs of forced entry into the house, buckets of firewood found near him indicated Donald had been returning from wood-gathering when attacked, and Mary Ann had been attacked from behind.  Another piece of evidence that suggested someone close to the Duvardos was that the burglary looked staged to several law enforcement officers in that, although Mary Ann's

purse and Donald's wallet were gone, there were many valuable items left in sight and some things that had been disturbed or emptied appeared not to have been searched.  (As explained in more detail in the next section, staging of a burglary is seen as an effort to mislead law enforcement so they won't focus on someone close to the victims on whom suspicion might otherwise fall.  Though a burglary can have a variety of felonious objects, the kind of burglary mentioned in this case is the common entry into a residence to steal things)  The brutality of these killings suggested a high level of anger toward the victims.[3]   There also was some suspicious behavior by Petitioner, including the unexpected nature of his visit to Nice with his sister on April 6,[4] his conflicting information to police about when he had last been in the house and why he made the trip on April 6, his statements to his siblings (once police asked for hair and blood samples) that he had his hair cut and had nose bleeds many times in that house, his handling of the keys sent to him by his brother James, his lies about the reason for the loan he obtained from his parents, and his homing in on Boeing meeting attendance information for March 31 rather early on in the investigation.

There was of course evidence that was favorable to the defense.  Neighbor Burke walked around the house on April 2, and saw nothing suspicious.   A deputy checked on the house on April 5 at the request of Janet Duvardo (Petitioner's sister), and also saw nothing suspicious.  This was of low probative value, however, because there was no evidence that the victims or the ransacking could be seen from outside the home.  A gate that had been shut on April 2 was open on April 6, but it may have been left open by the officer who checked the property on April 5.  There was conflicting evidence about which lights were on and which were off in the home, although there was some evidence that the lights were on timers. Petitioner's fingerprints were not found at the scene.

As the foregoing shows, this was a case in which the parties argued for conflicting inferences from the evidence.  In habeas, the court assumes that the trier of fact resolved such conflicts in favor of the prosecution.  Doing so, the court concludes that a rational trier of fact could have found proof of guilt beyond a reasonable doubt.  The blood on the towel was highly incriminating.  The sign-in sheets for the March 31 meetings gave the alibi in this case

15

real substance, but the evidence that it was possible for Petitioner to have accessed and

signed the sheets after-the-fact really undermined that alibi in light of the DNA evidence.

The alibi evidence did not raise a reasonable doubt that Petitioner was at the scene of the

crime on March 31.  The evidence about the state of decomposition of the bodies was very

helpful for the defense, but the overall evidence did allow a rational jury to conclude that the

victims had been killed on March 31.  There was sufficient evidence that Petitioner was the

killer and that he killed his parents on March 31.  Some of Petitioner's arguments suggest

what the evidence might show and how a jury might view the evidence differently, but these

suggestions do not aid him because this court presumes that the jury resolved any conflicts in

the evidence in favor of the prosecution.  The California Court of Appeal reasonably found

that there was sufficient evidence of identity and date of death to support the murder

convictions.  Petitioner is not entitled to the writ on this claim.

B.     Admission Of Expert's Testimony

Petitioner contends that his right to due process was violated by the introduction of

"victimology" testimony by the prosecution's expert witness, Mark Safarik.   Petitioner does

not precisely define the term and his objection goes to more of Safarik's testimony than just

the portion Safarik identified as the victimology portion.

1.     Background

Mark Safarik was a supervising special agent in the Behavioral Analysis Unit of the

F.B.I., specializing in crime analysis.  He had almost 25 years of law enforcement experience

(7 years as a city police officer followed by more than 17 years at the F.B.I.), and had been

involved in investigating over 3,000 homicides.  In his crime analysis work, he examined

very violent and unusual homicides, serial sexual assaults, sexual assaults of elderly women,

cases involving threats, and "equivocal" death cases (i.e., those with an unknown cause).  He

specialized in assigning certain personality characteristics to behavior that occurred at a

crime scene; he did not, however, try to determine the particular person who committed the

crime.

In the Duvardo case, Safarik had done a crime analysis and written a report in July

16

1  1999.  See CT 555-571.   The report on F.B.I. letterhead apparently was not admitted as

2  evidence.  It was a 17-page single-spaced document that included an introductory section that

3  described the author and the materials he considered, followed by sections labeled

4  "Victimology," "Medical Examiner's Report," "Crime Scene Analysis," "Offender

5  Characteristics and Traits," and "Post Offense Behavior."  The trial court excluded testimony

6  from Safarik relating to pages 15-17 of his report that purported to identify traits of the

7  killer.[5]

8      Safarik had not visited the crime scene until the day before he testified and was not

9  involved in the investigation of the murders other than to prepare his crime analysis.  To do

10  his crime analysis, he reviewed the police reports relating to the crime and investigation,

11  autopsy report, evidence reports, autopsy photos, crime scene photos, a videotape of the

12  house made after the bodies were removed, maps of the area, and diagrams of the house.  He

13  also considered information provided by the victims' adult children in questionnaires they

14  had filled out about their parents' behavior and activities to do the victimology portion of the

15  report.[6]  Based on the information gathered, Safarik offered his opinion on the meaning that

16  could be drawn from several aspects of the crime scene and from information he had learned

17  about the victims.

18      Safarik's testimony presented a hypothesized narrative of the criminal activity based

19  on his interpretation of the evidence:  The Duvardos let the killer into the home and did not

20  perceive him as a threat.  Mary Ann had been sitting at a desk, was grabbed from behind, and

21  killed while laying on her stomach where her body was found.  Donald walked in from

22  gathering firewood and discovered his dead wife's body.  Donald was quickly attacked,

23  backed into the laundry room from which there was no escape, tried to defend himself, and

24  was stabbed to death before he hit the floor.  The killer then ransacked the house to "stage" it

25  to look like there had been a burglary.  Strangers have no reason to stage a burglary (i.e.,

26  strangers would either steal things or not, but not just pretend to steal things).  Staging is an

27  attempt by the offender to misdirect law enforcement investigators.  This is because the

28  offender perceives that he or she will be the focus of the police investigation.  "The

significance of staging is that it indicates that there is a relationship of some sort between the offender and the victim."  RT 854.  The excessive level of violence, or overkill, suggested that the anger was personalized, and it was very significant that the overkill continued from one victim to another.  He thought it would only take 10-15 minutes to do the ransacking that was done at the house.

Safarik offered six main opinions in this case that Petitioner protests:  (1) the victims were at a low risk of becoming victims, (2) the killer was known to the victims and not perceived by them as a threat, (3) the burglary was staged to mislead law enforcement officers and divert attention away from someone close to the victims on whom suspicion might otherwise focus, (5) the killer acted with a high level of rage or anger toward the victims, and (6) the victims were killed between about 7:30 a.m. and 10:20 a.m. on March 31, 1999.

Petitioner contended on appeal that Safarik's testimony was improper character evidence of the victims as security conscious and the assailant as enraged, should have been subjected to a <u>Kelly/Frye</u> hearing, was improper expert testimony in that it was not beyond the common experience of the jury and amounted to an improper opinion on guilt, and violated due process.  The California Court of Appeal found the claims waived by defense counsel's failure to make a proper and timely objection, and also rejected the claims on the merits.

The state appellate court rejected the contention that the testimony was impermissible character evidence.  The testimony that the couple was security conscious was habit evidence rather than character evidence, and was a reasonable inference based on Safarik's extensive law enforcement background plus the information about the dead bolt on the front door and other security measures taken by the couple.  The testimony that the killer must have been enraged "is also a reasonable inference, again enhanced by the agent's experience, based on the number and nature of the wounds and the obvious ferocity of the attacks."  Cal. Ct. App. Opinion, p. 27.

The state appellate court explained that a <u>Kelly/Frye</u> hearing was not necessary

because Safarik was not offering the sort of scientific expert testimony based on new and

untested scientific principles or procedures.  His was "merely opinion evidence to help the

jurors understand certain characteristics of the crime scene."  Cal. Ct. App. Opinion, p. 26.

Most relevant to the claim presented in the federal habeas petition is the state

appellate court's decision on the assertion that Safarik gave improper expert testimony.  The

court explained that, under state law, a witness may not testify to an opinion of the guilt of

the defendant or to conclusions or inferences that can just as easily be drawn by the jury.

> Here Special Agent Safarik was only adding to the jury's common knowledge his
> expertise of crime scene reconstruction.  His task was to assist the jury in interpreting
> the physical characteristics of the crime scene.  He brought to that task his experience
> in reviewing or investigating over 3,000 homicides.  He did not testify to some
> fledgling scientific technique or to some "junk science" called "victimology."  Indeed,
> what he dubbed "victimology" was only a small part of his testimony, and was only an
> analytical attempt to discover why Donald and Mary Ann Duvardo became homicide
> victims.  His testimony was as old as Sherlock Holmes, and was properly admitted to
> help the jury understand certain characteristics of the crime scene.  The expert
> testimony did not specifically address the guilt or innocence of the defendant, but
> provided information beyond the jurors' experience that the jurors were free to accept
> or reject. [footnote omitted.]

> Even though facts may be within the knowledge or understanding of the trier of fact,
> the conclusions to be drawn from them may require expert testimony.  The decisive
> consideration is whether the opinion of the expert would assist the trier of fact because
> the matter is beyond common experience.  (People v. Harvey (1991) 233 Cal.App.3d
> 1206, 1227.)  Here the expert reached conclusions that assisted the jurors to
> understand the possible significance of certain connected pieces of evidence without
> reaching the ultimate issue of the defendant's guilt. [Citation.]  For example, the
> expert's conclusion drawn from the number, placement, and severity of the stab
> wounds is no different from commonly received expert testimony that concludes that
> certain cuts on a victim's hands were defensive in nature indicating an attempt to fight
> off an assailant.

Cal. Ct. App. Opinion, pp. 25-26.

2.    Analysis

The state court's evidentiary ruling may be addressed in a federal habeas action only if

it violated federal law, either by infringing upon a specific federal constitutional or statutory

provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Henry v. Keenan, 197 F.3d 1021,

1031 (9th Cir. 1999), cert. denied, 528 U.S. 1198 (2000); Walters, 45 F.3d at 1357.  Failure

to comply with state rules of evidence is neither a necessary nor a sufficient basis for

granting federal habeas relief on due process grounds.  See Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  See id. at 920.  Because this is a federal habeas case, this court does not determine whether the expert's testimony was properly admitted under state law, Ainsworth v. Calderon, 138 F.3d 787, 796, amended, 152 F.3d 1223 (9th Cir. 1998), and does not consider whether the evidence passes muster under the Federal Rules of Evidence or Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), which was not decided on constitutional grounds.

That the state court may have decided the witness qualified as an expert does not end the matter, as there is room for habeas relief when the expert testimony is mere quackery.  If a phrenologist is allowed to give expert testimony as to a defendant's mental state during the commission of a crime, or if a psychic medium is deemed qualified to give expert testimony about a seance in which the deceased described what the defendant had done to him, fundamental fairness might require a new trial.  Petitioner would have this court believe that Safarik's testimony falls somewhere between the opinions of psychic mediums and phrenologists on the continuum of quackery.  The court disagrees, although it does recognize the controversial nature of crime analysis as courtroom evidence.

The really controversial part of crime analysis is the offender profiling part.  See Malcolm Gladwell, Dangerous Minds, The New Yorker, Nov. 12, 2007, at 36; James Aaron George, Note, Offender Profiling and Expert Testimony: Scientifically Valid or Glorified Results?, 61 Vand. L. Rev. 221 (2008).  Expert witness crime analysis has met with mixed results in court, with offender profiling being the least well-received.  See, e.g., People v. Fletcher, 2007 WL 3072864, *20 (Cal. Ct. App. 2007) (unpublished decision) (no error in allowing F.B.I. crime analyst (Safarik) to testify about profile of typical burglar and opine that whoever killed victim and ransacked the house did not fit that profile – this was a proper subject of expert testimony, as a layperson lacks the knowledge and experience to determine how common such behavior is for burglars); id. (Safarik's testimony about characteristics of unidentified person he believed committed the murder did not have sufficient foundation for

its admission, but was harmless error); <u>State v. Patton</u>, 120 P.3d 760, 782-85 (Kan. 2005) (<u>Frye</u> test did not apply to F.B.I. behavioral analyst's testimony that a crime scene was staged because it was pure opinion testimony, i.e., "expert opinion developed from inductive reasoning based on the expert's own experiences, observations, or research," and the validity of which is tested by cross-examination); <u>State v. Stevens</u>, 78 S.W.3d 817, 835 (Tenn.), <u>cert. denied</u>, 537 U.S. 1115 (2002) (no error in refusing to allow F.B.I. crime analyst to testify about the probable motive of the perpetrator based on evidence at the scene of the crime); <u>People v. Hurth</u>, 2002 WL 1172930, *16-18 (Cal. Ct. App. 2002) (unpublished decision) (no error in allowing F.B.I. crime analyst (Safarik) to testify about "undoing" behavior by offenders and its implications); <u>Simmons v. State</u>, 797 So.2d 1134, 1151 (Ala. Crim. App. 2000) (F.B.I. agent's testimony that crime scene indicated the offense was sexually motivated was admissible; court found this was not offender profiling).

Here, however, the offender profiling evidence was excluded so this court need not decide whether its admission would violate due process. Thus, this is not a case where a crime analyst has been allowed to profile the perpetrator in terms of identifying for the jury the characteristics and personality traits of the offender. The due process analysis proceeds mindful that this part of Safarik's crime analysis was not presented to the jury but also mindful that the different areas of Safarik's report have some overlap so that some information about the perpetrator was provided.

The admission of Safarik's testimony did not violate due process. Safarik's testimony was relevant to the issues in the trial. Most jurors have a very limited exposure to real criminal activity. Safarik's testimony was helpful to the jury in that it provided meaning to some evidence presented to the jury. For example, although the jury could look at the pictures of the crime scene and perhaps see that there were cameras, radios and jewelry boxes in the pictures, Safarik was able to provide meaning and context that went beyond that ordinarily known to lay people, i.e., that these valuable being left behind suggested this was a staged burglary, and that total strangers don't have a reason to stage burglaries, which in turn suggested the killer was someone close to the victims.

The victimology evidence also did not violate due process.  Safarik tried to figure out why these particular people would become crime victims.  From the victimology study, plus the information from family and acquaintances, plus what he saw on a site visit, Safarik opined that the victims were very security conscious even though they lived in a low crime area.

Petitioner suggests that Safarik essentially gave the prosecutor's closing argument in the middle of the evidence presentation.  But this overlooks Safarik's law enforcement expertise and his ability to draw on that extensive experience as well as his study of crime scenes in particular to opine what certain physical evidence meant.  For example, as one who had been involved in literally thousands of homicide investigations, he had extensive experience on which to base an opinion that the numerous stab wounds to both victims suggested a high level of anger.  (Dr. Gill testified to a similar opinion.)  This was beyond the ken of most jurors, who usually do not necessarily have any background in how many stab wounds a murder victim usually has, or the number or nature of stabs that will kill a person, or the implication of numerous stab wounds.

Petitioner argues that it is improper for an expert to express an opinion concerning the guilt or innocence of the defendant.  But he neglects to note that this expert never offered such an opinion.  RT 814 (the analysis is a tool to help focus the law enforcement investigation; "[w]e never, ever identify a particular offender.")  Safarik never identified Petitioner as the killer; the closest he came was to say that the killer was someone known to the victims.  Even if Safarik had opined on the ultimate issue, that alone would not necessarily support habeas relief.  The United States Supreme Court has left open the question whether the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact.  See Moses v. Payne, 543 F.3d 1090, 1105 (9th Cir. 2008).  Thus, while, under Ninth Circuit precedent, it is "well established . . . that expert testimony concerning an ultimate issue is not per se improper," id. at 1106 (quotation and citation omitted), for purposes of habeas corpus review it suffices to determine that no Supreme Court case has squarely addressed the issue and, therefore, a state

appellate court's decision affirming the admission of such testimony is not contrary to or an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1).  See id. at 1106.

Petitioner correctly notes that Safarik's testimony that Donald was "probably pleading for his life," RT 840, was beyond the scope of his expertise and pure speculation.  That statement did not make the trial fundamentally unfair or have any prejudicial effect.  The jury was confronted with a case in which a septuagenarian husband and wife apparently going about their normal household activities were brutally stabbed to death, so the witness' speculation that Donald – as to whom there was uncontradicted evidence of more than a dozen stab wounds in his chest area and defensive wounds to his hands – may have begged for his life hardly painted a worse picture of the murders and did not inflame the jury's passion.  Cf. Drayden v. White, 232 F.3d 704, 712-13 (9th Cir.  2000), cert. denied, 532 U.S. 984 (2001) (prosecutor engaged in misconduct when he delivered a soliloquy in the voice of the victim as his closing argument).

The admission of Safarik's testimony did not render Petitioner's trial fundamentally unfair.  The California Court of Appeal's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to the writ on this claim.

C.    Admission of Evidence of Financial Dealings And Marriages

Petitioner contends that admission of evidence of his financial dealings and dual marriages violated his right to due process.  The evidence regarding Petitioner's financial dealings and marriages was described by the California Court of Appeal's opinion at pages 12-15.

There was evidence about Petitioner's dual marriages.  He and Jan Duvardo were married in 1980 and separated in 1989.  Petitioner and Jan did not divorce until long after these murders.  While still married to Jan, he married Molly in 1993.  He paid child support for Nicole (his daughter with Jan) until 1993.  When Jan heard he had remarried and confronted him in 1993 or 1994, Petitioner claimed "his current relationship was a 'spiritual

union,' and that he had 'some sort of physical ailment where he felt that he might very possibly die, and he did not want to die alone.'" Cal. Ct. App. Opinion, p. 12.   Jan twice avoided foreclosure on her house by borrowing money from Petitioner; when she faced foreclosure again in late 1998, she told Petitioner but did not ask him for money.  Jan lost her house and moved in with her parents in January 1999.

There was evidence about Petitioner's financial dealings that showed that he borrowed money from several people, often did so unbeknownst to his wife Molly, and often told lies in connection with obtaining the loans.  First, he borrowed $7,500 from Edward Clevenger in November 1997 and repaid it by July 1998.  Molly mentioned to Clevenger that she borrowed money from her 401(k) account to repay the loan.  Second, Petitioner borrowed money from his friend Ken Ferguson in April 1998.  The evidence was that Petitioner "became very distraught and cried, claiming he needed $10,000 to pay off some debts or he would lose custody of his daughter.  Defendant knew that Ferguson's wife had died of cancer the previous year, and Ferguson had received $150,000 from a life insurance policy." Cal. Ct. App. Opinion, p. 13.  Ferguson tried repeatedly to get the loan repaid in 1998, and Petitioner repeatedly deferred – often claiming he was working on repayment, another time claiming he was selling a house and would soon have the money, another time claiming he had cancer from his platoon's exposure to Agent Orange in Vietnam, another time grabbing his chest and claiming he was dying of cancer, and another time claiming that Molly had found out about a "'a gun deal that had gone bad.'" Cal. Ct. App. Opinion, p. 13.   When Ferguson told Molly about the loan, she was surprised and had not known about the loan.  Molly repaid the loan, after saying Ferguson should have contacted her before lending money to Petitioner.  Third, he borrowed $54,000 from Douglas Bernards, an acquaintance from Molly's equestrian hobby in June 1998, claiming he could repay the loan from the sale of a house and securing the loan with a second deed of trust on the house he owned with Molly.  Petitioner repaid that loan in three installments:  $30,000 on November 24, 1998, $10,000 on December 18, 1998, and the balance on March 1, 1999.  Petitioner initially told Bernards he did not want Molly to know about the loan, but she eventually learned of it.

24

1   Fourth, he borrowed from his parents.  The circumstances of that loan were explored at

2   length during the trial:

3       A friend of the Duvardos [Georgia Floheisch] testified that she learned from them that
        defendant claimed he needed money in late November 1998.  Supposedly, defendant
4       had told his parents he had been involved with "some sort of government service" –
        and in connection with that service, through "some sort of a transport of money or
5       goods," a certain amount of money was missing.  The Duvardos said they were going
        to loan money to defendant, but the loan would be documented and they would charge
6       him interest.

7       Also in November 1998, defendant contacted Donald's sister, Novell.  Defendant was
        upset and said he was in trouble.  He said he had forged Molly's signature on a second
8       trust deed and needed $26,500.  Molly had stopped sleeping with him and defendant
        thought she might divorce him. . . .
9
        On the next day defendant brought Donald and Mary Ann to meet Novell and her
10      husband Ronald.  Defendant said he had been working undercover for the Central
        Intelligence Agency for "the thrill of it."  He sold guns to foreign governments.  He
11      had received $5 million for one gun shipment but was $200,000 short.  He had made
        up $150,000 of that deficit with gold bullion and gems he had received as payment for
12      his services, but was still $50,000 short.  If he didn't come up with that sum by
        November 30, 1998, he would be killed– or so he said.  Defendant sobbed during this
13      tale.  Ronald saw no tears.  Ronald was "very suspicious of the story that we were
        hearing."  Novell and Ronald discussed various loan options with defendant, but he
14      never got back to them.

15      Analysis of [Donald and Mary Ann] Duvardos' financial records showed they took out
        a short-term loan on November 24, 1998, for $30,000.  The loan was secured by a CD
16      account. The proceeds were paid by check to defendant, who endorsed the check to a
        business owned by the Bernards.  On April 9, 1999–just days after the Duvardos were
17      killed–the bank withdrew over $30,000 from the CD account to satisfy the loan
        balance, plus interest.  There was no record of a separate $10,000 payment from the
18      Duvardos to defendant. . . .

19      [During an interview with police several weeks after the murder], Defendant said he
        had borrowed $40,000 from his parents on one occasion, and $10,000 on another.  But
20      his parents had recently forgiven the $30,000 loan.  He needed money due to "bad
        business decisions."  Defendant became emotional during one interview and appeared
21      to be crying – but the detective saw no tears.  Defendant also told detectives he
        worked for a covert agency–he led a five-man team that delivered guns and explosives
22      in exchange for gold, diamonds, and stocks and bonds.  On one occasion, he came up
        $200,000 short, and borrowed $30,000 from his parents in November 1998 to help
23      make up the deficit. [¶]  In another interview defendant denied working for a covert
        agency. . . .
24
    Cal. Ct. App. Opinion, pp. 14-15.
25
        The California Court of Appeal emphatically rejected Petitioner's claim that this was
26
    irrelevant and impermissible character evidence.  "We need not belabor this point.
27
    Defendant's intent and motivation were at issue.  The evidence, particularly the financial
28

evidence, was certainly relevant to defendant's motive for killing his parents. And character evidence may be admitted to show motive, intent, design or plan, absence of mistake, and the like. [Citations.] The admission of the background circumstances put the financial straits of the defendant in context." Id. at 27 (citations omitted).

As mentioned in section B above, the trial court's evidentiary ruling may be addressed in a federal habeas action only if it infringed upon a specific federal constitutional or statutory provision or deprived the defendant of the fundamentally fair trial guaranteed by due process. Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. See Jammal, 926 F.2d at 920. Further, even if the admission of the evidence was constitutionally erroneous, it must have to have a substantial and injurious effect on the jury's verdict for habeas relief to be proper. See Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir.), cert. denied, 534 U.S. 905 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

The state court's rejection of Petitioner's due process claim was not an unreasonable application of or contrary to clearly established federal law. The admission of the financial dealings and marriage evidence was not arbitrary or so prejudicial that it rendered the trial fundamentally unfair. The evidence was relevant to Petitioner's motive. Petitioner may have preferred a sanitized version of the evidence that showed only that he borrowed money and had financial difficulties, but the prosecution's theory was that there was more than one motive underlying his actions. It also was important to the prosecution theory to show that the various problems Petitioner had were interrelated, e.g., that he not only had a motive to avoid repaying the $30,000 loan from his parents, but also to keep his wife Molly from learning of that loan and other loans obtained without her permission and wanted to keep his wife Molly from learning that he was still married to his first wife (Jan). The multiple motives showed the magnitude of the problems Petitioner faced. The evidence about his various lies to obtain loans, to avoid repaying loans, and about the loans was relevant to show the interrelatedness of the multiple motives and how many things could quickly unwind for Petitioner if the loan from his parents was unpaid and became known to Molly. The

evidence about his parents' finances showed they did not have substantial funds such that they could let the loan go unpaid, as they had to take out a short-term loan themselves to lend the money to Petitioner after he said he'd be killed if he didn't come up with the money to complete an arms shipment.  The evidence also demonstrated Petitioner's desire to keep the loans and his continuation of his first marriage secret from Molly.  Molly was unaware that Petitioner had borrowed money from his parents in November 1998 until long after the murders.  She also apparently had told him not to borrow money from them.  On June 7, 1999, Molly talked to detective Paulich and was shocked to learn that Petitioner had borrowed money from his parents and was still married to his first wife (Jan).  She found it unacceptable and immediately called Petitioner, who confirmed he was still married to Jan.  Petitioner also told detective Paulich that he feared losing his wife (Molly) and child more than anything and he did not want his wife to learn of his financial dealings.  See CT 469-534 (6/7/99 interview transcript).

The evidence pertaining to Petitioner's financial dealings and marriages was not offered to show that he was a bad person or had a propensity to commit violent crimes. Deliberately killing one's parents is so inexplicable that there would be a lot of resistance to believing that someone would do it.  The prosecutor apparently felt it necessary to paint an elaborate picture of Petitioner's deceit and the interrelated financial and marital concerns to make believable to the jury that petitioner had a strong enough motive to do it.  The evidence was relevant to motive, and its admission did not violate Petitioner's right to due process. Even if the admission of the challenged evidence violated due process, the admission of the evidence did not have a substantial and injurious effect or influence in determining the jury's verdict, in light of the other uncontested evidence regarding his financial dealings.

D.      Ineffective Assistance Of Trial Counsel Claim

Petitioner contends that his trial counsel was ineffective in that he did not have tests conducted on the sign-in sheets from Boeing to see if Petitioner's signature was under that of other signatures on each page and did not have tests conducted on an envelope to determine whether it had been opened and resealed.

27

1    The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but

2    effective assistance, of counsel.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

3    The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of

4    ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the

5    adversarial process that the trial cannot be relied upon as having produced a just result."  See

6    id.  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show

7    that (1) counsel's performance was "deficient," i.e., his "representation fell below an

8    objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and

9    (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability

10   that, but for counsel's errors, the result of the proceedings would have been different, see id.

11   at 691-94.  The relevant inquiry under Strickland is not what defense counsel could have

12   done, but rather whether his choices were reasonable.  See Babbitt v. Calderon, 151 F.3d

13   1170, 1173 (9th Cir. 1998), cert. denied, 525 U.S. 1159 (1999).

14        Strickland addressed the deficient investigation scenario:

15        [S]trategic choices made after thorough investigation of law and facts relevant
          to plausible options are virtually unchallengeable; and strategic choices made
16        after less than complete investigation are reasonable precisely to the extent that
          reasonable professional judgments support the limitations on investigation.  In
17        other words, counsel has a duty to make reasonable investigations or to make a
          reasonable decision that makes particular investigations unnecessary.  In any
18        ineffectiveness case, a particular decision not to investigate must be directly
          assessed for reasonableness in all the circumstances, applying a heavy measure
19        of deference to counsel's judgments.

20   Strickland, 466 U.S. at 690-91; see also Turner v. Duncan, 158 F.3d 449, 456 (9th Cir. 1998)

21   (inexplicable failure to do even the most minimal investigation cannot be viewed as a

22   strategic decision by counsel).

23        1.    Boeing Sign-In Sheets

24        Petitioner contends that his trial counsel should have had three sign-in sheets from

25   Boeing tested to determine if Petitioner's signature had been placed on each paper before

26   other overlapping signatures.  (The CRB attendance sheet and IGC CIP approval sheet

27   appear to have signatures that overlap with Petitioner's signature; the IGC attendance sheet is

28   not in the record before this court.  See Amended Petition, Exhs. A, B.)  This court assumes

that the test would have something to do with the layering of ink on overlapping signatures, but Petitioner has not shown that such a test exists or would have produced admissible results.  If the results of this still-unidentified test were not admissible, he has not shown any reason counsel should have had the test conducted.

More importantly, Petitioner has not shown, or even alleged, that such testing would have yielded exculpatory evidence for him.  He takes the position that "there is no harm to [Petitioner] in the examination of these documents," Amended Petition, p. 38,  because even if he signed them last, it could not be determined whether he signed them last at the meetings on March 31 or days later.  His assumption that there was no downside to testing is wrong because the prosecutor almost certainly would know of any testing if the prosecutor had the original records, and any unfavorable results therefore would be learned by the prosecutor or could be figured out by him.  Additionally, merely saying there was nothing to lose is not enough to oblige counsel to have the documents tested.  Petitioner has not stated under oath (or even alleged in his petition) that he believed he signed the sheet before the other persons whose signatures overlapped his, or that he told his attorney he did.  If the client could not commit to that much, the attorney had no duty to have the documents tested, assuming such a test existed.  Even today, Petitioner appears uncertain, as he writes that his alibi would have been strengthened "if [his] signature is under any other signature."  Amended Petition, p. 39 (emphasis added).  Petitioner also does not state that he asked counsel to have the documents tested.  Although an attorney's obligations to investigate are not necessarily dependent on a client's demands for particular tests, the absence of information that Petitioner asked trial counsel to have such a test done, or tried on his own to have one done, or asked a state court to arrange for such testing of the documents suggests that he knows it would not have been a fruitful endeavor.  Cf. Langford v. Day, 110 F.3d 1380, 1386-88 (9th Cir.), cert. denied, 522 U.S. 881 (1997) (failure to investigate Miranda defense was not below the range of competence required where defendant failed to tell attorney about facts suggesting such a defense and insisted on going in another direction).[7]   He also presents no evidence he made any post-conviction inquiry to attorneys to learn why the tests were not done.

29

The record shows that trial counsel did extensive work to investigate and prepare the alibi defense, strongly suggesting that counsel considered and deliberately chose not to have the signatures tested. Upon receipt of information that an area of inquiry would not be fruitful, the attorney could reasonably decide not to pursue it further. Cf. Sanders v. Ratelle, 21 F.3d 1446, 1456-57 (9th Cir. 1994). Counsel apparently thought such a test existed, as is evident from his reference to it in witness examination and the closing argument. Counsel cross-examined detective Paulich about why the papers had not been tested, and received unclear answers about whether such tests existed or would have been definitive. RT 4737-4739. Detective Paulich indicated that the sheriff decided against testing the sign-in sheets because the test could not determine whether the signature ink was applied on March 31 as opposed to several days later , assuming the signature was applied last in order. In his closing argument, defense counsel urged that the prosecution's failure to conduct such a test was further evidence of inept police investigation. RT 5105, 5118. Another unrelated part of the record that indicates a conscious choice not to pursue this test is that, in preparing for the motion for new trial (by which time defendant had retained appellate counsel Dennis Riordan) new subpoenas for records relating to Petitioner's alleged presence in Southern California on March 31 were sought and obtained, yet there was no effort by counsel to have the sign-in sheets tested. See CT 854-942.

Even if counsel did not ponder having overlapping signatures tested, his failure to do so would not necessarily show deficient performance in light of the extensive development through other sources of the alibi defense. Focusing on that one test and ignoring all the other ways in which counsel investigated and presented the alibi defense is the kind of second-guessing that Strickland did not intend. See Pinholster v. Ayers, 525 F.3d 742, 761 (9th Cir. 2008); see, e.g., Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995), cert. denied, 517 U.S. 1111 (1996) (duty to investigate and prepare a defense is not limitless and does not require every conceivable witness to be interviewed); id. at 1038 (no duty to track down every record regarding defendant's mental health for mental health defense). Among other things, defense counsel obtained testimony from other Boeing employees and records

from Boeing about Petitioner's presence on March 31, developed evidence showing the lapses in Boeing security that would have allowed Petitioner to move around the plant without having used his employee access card that day, and developed evidence about the lax record-keeping at the car rental service about the mileage on the rental car.  Counsel did a very good job showing that the extensive record-keeping and tracking in the corporations turned out to be riddled with problems affecting reliability.  Counsel also obtained evidence from Petitioner's wife about his presence on March 31 in Southern California.

Respondent gives the argument short-shrift, and urges that an absence of testing was harmless because there was other strong evidence that Petitioner was not present at Boeing on March 31.  The court does <u>not</u> agree that the order of application of the signatures was unimportant.  Showing that Petitioner's signature was applied to the page before other attendees' signatures could have been quite helpful to the defense.  Instead, the court sees the problems with the claim to be the failure to show that such a test could have been done, would have resulted in admissible evidence, and would have been exculpatory.  Under those circumstances, Petitioner has not shown either deficient performance or resulting prejudice from the absence of testing.

### 2.   Envelope Containing Keys

Petitioner also contends that counsel should have tested an envelope he had sent to his attorney tested to determine whether the envelope had been opened and resealed.  James Duvardo had the locks on the house changed after the murders and sent to his brother (i.e., petitioner), his sister Janet, and detective Paulich copies of the keys for the new locks a few weeks after the murders.  Petitioner presented evidence that he had never opened the envelope, but simply stored it unopened for several months and then gave the still-unopened envelope to a lawyer for safekeeping to show that he had never opened it.  The prosecutor argued that Petitioner could have slit the envelope open with a knife and resealed it, but never presented any evidence that he had done so.  The relevance of whether the envelope was opened was that James Duvardo told police that he thought Petitioner had been in the house based on the return of his father's memento box and his later discovery of removed

files and shredded documents in a trash can.   At trial, the prosecutor stated in his closing argument that it was possible that Petitioner opened and resealed the envelope but stated that it "doesn't have any connection to the killings."  RT 5195.  The prosecutor urged the jury to look at the envelope and see that someone "could take a knife or a letter opener and slit right up along one of the edges that folds over and re-glue it.  It's sticking out in an upright position.  He can take the keys out and go to the other house."  RT 5195.

Petitioner has not shown that there was a test that could definitively show that the envelope had not been opened and resealed, or that such a test would have resulted in admissible evidence.  As with the signature-testing, there was no reason to test the envelope if the results would not be admissible in evidence.  As the prosecutor argued at trial and respondent argues here, the jury apparently could look at the envelope and see if it could be opened and resealed.  Trial counsel did develop testimony from Petitioner's wife and the receiving attorney to try to show that the envelope was never opened, so this is not a case where the line of inquiry was not explored or investigated.  Also, defense counsel established that no one saw Petitioner at the house in Nice in those months and there was no evidence of him traveling to the area.  Finally, the unopened vs. opened state of the envelope was somewhat of a lose/lose proposition for Petitioner:  evidence that he took the unusual step of specifically choosing not to open an envelope he received from his brother three weeks after the death of their parents (e.g., to see if there was a note or anything besides the keys) might suggest a guilty conscience by a person worried about being suspected.  Petitioner has not shown deficient performance or prejudice in counsel's conduct with respect to the envelope.

In sum, as to both the documents and the envelope, Petitioner has not shown the tests existed, the test results would have been admissible in evidence, or that the test results would have been exculpatory to him.  Petitioner has not shown ineffective assistance of counsel based on the fact that the sign-in sheets and envelope were not tested.  The state court's rejection of the ineffective assistance of counsel claim was not contrary to or an unreasonable application of Strickland.

1    E.    <u>Exclusion Of Car Evidence</u>

2        Petitioner contends that his right to present a defense was infringed by the trial court's

3    exclusion of evidence that cars were seen near the victims' home in the days after March 31.

4    One neighbor (who had passed away by the time of trial) told police she thought she saw a

5    white car in the Duvardos' driveway on Easter Sunday.  Another neighbor told police that he

6    thought he saw a small red car in the driveway on Easter Sunday.  A third neighbor told

7    police he saw a golden colored car parked near the Duvardos' driveway.  These vehicles were

8    never linked to Petitioner, the victims, friends or family of the victims, or anyone in the

9    neighborhood.  He argues now that evidence about the three cars should have been admitted

10   to show that there was activity at the Duvardo household that showed they were still alive

11   days after he allegedly killed them.

12       A hearing was held on a motion <u>in limine</u> regarding the admissibility of evidence of

13   other persons who had been investigated by the police during their investigation of the

14   murder and the evidence of the unrelated cars seen in the neighborhood.  RT 133-160.  At

15   that time, the evidence was discussed in the context of attempting to present third party

16   culpability evidence.  The trial judge ruled that the evidence of other potential suspects and

17   the cars was inadmissible on the record as it then stood, but specifically noted that he was

18   open to reconsidering his ruling if the defense found more compelling evidence.  RT 154,

19   155.  Due to the absence of any direct or substantial circumstantial evidence connecting the

20   third parties or the cars to the commission of the murders, the evidence was not probative and

21   had the likelihood to mislead the jury.  <u>See</u> RT 154-155.   The judge found it a "far stretch" to

22   say that the cars were connected to the crime.  RT 157.  Defense counsel did not endeavor to

23   argue <u>in limine</u> the point that Petitioner now urges, i.e., that the cars were probative of

24   activity at the household after the day on which the prosecutor alleged the murders occurred.

25   <u>See</u> CT 393-395.  The admissibility of the evidence apparently was not revisited at trial.

26       The U.S. Constitution gives a criminal defendant the right to present a defense.

27   "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in

28   the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the

33

Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (citations omitted).  The Due Process Clause does not guarantee the right to introduce <u>all</u> relevant evidence.  <u>Montana v. Egelhoff</u>, 518 U.S. 37, 41-42 (1996).  A defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.  <u>Id.</u>  In determining whether the exclusion of evidence was constitutionally impermissible, the court balances the importance of the evidence to the criminal defendant against the state's interest in excluding the evidence.  <u>Miller v. Stagner</u>, 757 F.2d 988, 994 (9th Cir.), <u>amended</u>, 768 F.2d 1090 (9th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1048, <u>and cert. denied</u>, 475 U.S. 1049 (1986); <u>Perry v. Rushen</u>, 713 F.2d 1447, 1453 (9th Cir. 1983), <u>cert. denied</u>, 469 U.S. 838 (1984) (no constitutional violation in excluding evidence that another man was seen near scene and that he had history of sexual attacks where identification of petitioner was strong).  Even if the exclusion of evidence was a constitutional error, the erroneous exclusion must have had "a substantial and injurious effect" on the verdict for habeas relief to be granted.  <u>Brecht</u>, 507 U.S. at 623.

Petitioner has not shown a constitutional violation based on the court's ruling excluding the evidence regarding the reports of cars in and near the Duvardos' driveway. First, it is questionable whether Petitioner's claim should even be entertained in habeas because he did not argue this basis for admissibility of the evidence at trial.  At trial, the cars were argued to be relevant as to third party culpability rather than to show continued life in the household after March 31, so faulting the trial court for not ruling on an argument he did not make for the evidence's admissibility seems unreasonable.  Second, the claim fails on the merits.  The report of the deceased neighbor who saw a white car would have been inadmissible as hearsay, so there were only two reports that could have been presented – one of a red car in the driveway and another of a golden car near the driveway.  But no neighbor saw any person around those cars, or saw any person go from the cars to the victims' house, or had any evidence to make the large leap from the existence of cars in the area of the house to activity in the household on Easter Sunday (April 4).   The evidence would have been

irrelevant or at least subject to exclusion under California Evidence Code § 352, a standard rule of evidence that can be applied without offending due process.  The exclusion of the evidence did not mean that the jury received a biased and false picture of the evidence, contrary to Petitioner's assertions.

Petitioner relies on the case of Holmes v. South Carolina, 547 U.S. 319 (2006), for the proposition that a defendant's rights "were violated by evidence rules under which the defendant may not introduce evidence of a third party guilt if the prosecution has introduced forensic evidence that, if believed, supports a guilty verdict."  Amended Petition, p. 42. Holmes does not help him.  In Holmes, the Court noted that rules limiting the admissibility of third party evidence were widely accepted and not challenged in that case.  Holmes, 547 U.S. at 327.  The rule struck down in Holmes was one that excluded third party culpability evidence if the prosecution's forensic evidence was strong.  The vice of such a rule was that admissibility turned not on the probative value of the evidence but instead on the strength of the prosecution's case, and that problem was exacerbated by the absence of opportunity to challenge the prosecution's evidence in determining whether to admit the third party culpability evidence.  See id. at 329.  Such a rule was simply illogical in the context of normal principles of evidence.  See id. at 330-31.  In Petitioner's case, by contrast, the trial court did not evaluate the admissibility of the car evidence based on the strength of the prosecution's case, but instead did a routine evaluation of the evidence and concluded in accord with normal principles of the law of evidence that the evidence about other people considered by police and the cars seen in the area was not probative and was likely to mislead the jury.  See Perry, 713 F.2d at 1453-55 (upholding exclusion of third party culpability evidence)   Holmes did not depart from the rule that state lawmakers have broad latitude in establishing rules of evidence so long as they do not infringe upon a weighty interest of the accused and are not either arbitrary or disproportionate to the purposes they are designed to serve.  See id. at 324-25.  The exclusion of the evidence about the cars was consistent with the principles in Holmes, Crane, and Egelhoff.

Finally, in light of the weakness of the car evidence, it can be said with certainty that

its exclusion did not have a substantial and injurious effect on the verdict.   The car evidence left so many questions unanswered and could so easily have been attacked by the prosecution – by showing the absence of any connection between the existence of the cars and any activity in the victims' household on April 4 – that its exclusion made no difference.  No reasonable jury would have made the leap from cars reported in the area on April 4 to continued life in the victims' household on that date, especially in light of the physical evidence that included mold in the coffee grounds in the coffee maker two days later, the absence of any internet activity after March 31, the mail accumulating in the post office box on and after March 31, and the unanswered messages on the answering machine on and after March 31.   Petitioner is not entitled to the writ on his claim that the exclusion of the car evidence violated his constitutional rights.

F.   Cumulative Error Claim

In some cases, although no single trial error is sufficiently prejudicial to warrant relief, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  See United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  There were not multiple errors in Petitioner's trial, so there are no errors to accumulate and consider under the cumulative error doctrine.

G.   Ineffective Assistance Of Appellate Counsel Claim

The Due Process Clause guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  See generally Evitts v. Lucey, 469 U.S. 387 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland, 466 U.S. 668.  See Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner therefore must show that appellate counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  See id. at 1434 & n.9 (citing Strickland, 466 U.S. at 688, 694).  The Constitution does not require appellate counsel to raise every colorable or non-frivolous claim; to the contrary, effective appellate advocacy involves weeding out weaker claims in order to focus on stronger ones.  See id.  Appellate

counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice because he declined to raise a weak issue. <u>See</u> <u>id.</u>  That is the case here.

Petitioner contends that appellate counsel was ineffective for failing to assert the claims discussed in sections D-F, i.e., the claims that counsel was ineffective in not having the sign-in sheets and envelope tested, that the exclusion of the car evidence was improper, and that there was cumulative error.  As discussed in sections D-F, however, Petitioner is not entitled to any relief on those claims.  Appellate counsel was within the objective standard of competence and caused no prejudice by not presenting these weaker and ultimately unsuccessful arguments.   Petitioner is not entitled to the writ on his ineffective assistance of appellate counsel claim.

**CONCLUSION**

The amended petition for writ of habeas corpus is DENIED on the merits.  The motion for an evidentiary hearing is DENIED.  (Docket # 28.)

The clerk shall close the file.

IT IS SO ORDERED.

DATED: January 5, 2009

_____
Marilyn Hall Patel
United States District Judge

37

1

**NOTES**

2

3    1.    CALJIC 2.01, the pattern jury instruction about circumstantial evidence given in this and other California cases, states:

4        However, a finding of guilt as to any crime may not be based on circumstantial evidence

5        unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶]

6        Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.  In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable

7        doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt. [¶]  Also, if the circumstantial evidence as to any particular count

8        permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's

9        innocence, and reject that interpretation that points to his guilt. [¶] If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to

10       be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

11   Arguably, that instruction may give a defendant more benefit than that which is constitutionally required, as the Supreme Court has rejected an argument that circumstantial

12   evidence requires a separate special instruction about inferences.  See Holland v. United States, 348 U.S. 121, 139-40 (1955) (direct appeal case rejecting contention that the judge

13   had to instruct that where prosecution's evidence is circumstantial, it must be such as to exclude every reasonable hypothesis other than that of guilt: "the better rule is that where

14   there the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect").  The Ninth Circuit model

15   instruction also do not give a special instruction for circumstantial evidence other than to explain what it is.   See Ninth Circuit Model Crim. Jury Instr. 1.6.

16

17   2.    Petitioner's normal work hours were 6:00 a.m. - 2:42 p.m. at Boeing.  According to his wife, Petitioner usually woke up at 3:45 - 4:00 a.m., and left home at about 4:30 a.m.  She

18   noticed his awakening because, at 6'2" and 280 pounds, his movements were obvious.  His job duties included taking proposals and estimates back and forth between the group that handled cost

19   estimates for modifications to aircraft and another unit that decided the requests for modifications. He also coordinated things between those people calculating the costs and those who made the

20   decisions by ensuring that various groups had made the necessary estimates and then delivering the packets to the appropriate group.  Earlier in his career, he had worked as a police officer for a couple

21   of years, and at one time had worked as a security officer at the plant that later became the Boeing plant.

22   3.    The forensic pathologist testified about his autopsy findings.  Donald had suffered 14-15 stab wounds and would have died in a matter of minutes, and he had several slicing, defensive

23   wounds on his hands.  Mary Ann died from a combination of sharp and blunt force injuries that would have caused death within minutes.  The knife wounds to her were n her back and neck;

24   her neck was slashed front to back and she had been stabbed in the neck where she lay on the floor.  She also had several post-mortem stab and slash wounds on the top of her head that

25   dented but did not penetrate the skull.  She had a flailed chest (i.e., fractures on both sides of her rib cage in the front) consistent with a weight being pressed on her back, such as a person

26   kneeling on her back.  She also had a blunt force trauma directly to one of her eyeballs and bruising on her forehead; although the forehead bruising may have come from hitting the flat

27   surface of a desk as she fell, the eyeball injury could not have been so caused and was instead from a direct hit to the eye.  They had both eaten within a few hours of death, but the particular

28   foods could not be determined.  The same kind of single-edged stabbing instrument appeared to have been used on both.

4.      The prosecutor argued in closing that Petitioner made the trip because he realized at some time after he left the house that he had forgotten the towel in the sink.  RT 4909.

5.      The trial court determined that Safarik could not testify about the "offender characteristics and traits" section of the crime analysis report, CT 569-571.  That section of the analysis suggested the offender was a male Caucasian, at least 35 years old, who had a long-standing personal relationship with the victims; was expected to be of average intelligence and capable of having graduated high school, likely to be employed and to have an employment history commensurate with his academic background; had acted alone and nothing indicated he was under the influence of drugs or alcohol; and was expected to have a short temper.  The analysis also predicted certain post-offense behavior by the offender, CT 570-571, as to which there was no interest in having admitted at trial.

6.      The "Victimology" section explained the purpose of studying the victims and what had been learned in this case.

VICTIMOLOGY

Examination of the victims' background is a significant part of the analysis process.  Their vulnerability to becoming victims of violent crime was examined in conjunction with a review of their lifestyle, reputation, behavior, personal history, and social and sexual habits.  Specifically, what was it about these victims or their situation which made them susceptible to becoming victims of a violent crime?

The victims, DONALD DUVARDO, and his wife MARY ANN DUVARDO had been married more than fifty-two years.  Both of them were retired and had lived for at least the last fifteen years in a well-maintained home situated in a middle class residential neighborhood in Nice, California.  The crime rate in this area is very low and there had been no violent crimes involving assault, rape or homicide.  Nice, California is a small residential community situated near Clear Lake with a population of roughly 2500 people in a county with a population of approximately 55,000.

M. DUVARDO was a seventy-year-old white female.  She resided with her husband, D. DUVARDO, a seventy-six-year-old white male.  The victims had three adult children.  Both of the victims were reported to be in good health.  They maintained a semi-active lifestyle and were involved with the National Country Square Dancers Association.  According to their children, the DUVARDO'S had a fairly regular daily schedule.  They generally arose around 7:30 AM, made coffee and when they were finished with the coffee, they would unplug the coffee pot [the coffee pot was found unplugged during the crime scene search.] They usually picked their mail up at the Post Office around 11:00 AM and returned home.  They generally went to bed around 9:30 PM.  Their neighbors described them as friendly, quiet, personable and very security conscious.  Neither family members nor neighbors were aware of anyone who would want to do them harm.  The victims had not reported being bothered by anyone nor did they express any concern for their safety.  The children of the victims also described their parents as having a loving relationship and being quite security conscious.  The victims were financially secure and lived a conservative lifestyle.

Overall, there is nothing in the backgrounds of both DONALD and MARY ANN which would suggest that they were at anything but a low risk and statistically unlikely of being the victims of a violent crime.  Based upon the nature of the attack and the subsequent activity at the crime scene, it would be highly unlikely that the victims' deaths were at the hands of a total stranger.  We feel the assailant targeted the victims, a point that will be more appropriately addressed under the Crime Scene Analysis section of this report.

CT 556-557 (emphasis and brackets in source).

39

7.      Petitioner did not develop the factual basis of his claims in state court proceedings and he has not shown that his claims fall within the narrow limits of 28 U.S.C. § 2254(e)(2). Since the enactment of the AEDPA, the district court's discretion to grant an evidentiary hearing has been restricted.  A district court may not hold an evidentiary hearing on a claim for which the petitioner failed to develop a factual basis in state court unless petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Petitioner has not shown that he diligently tried but was unsuccessful in developing the factual basis for his claims in state court.  See Williams (Michael) v. Taylor, 529 U.S. 420, 431-32 (2000).  Accordingly, he is not entitled to an evidentiary hearing.  Even if one assumes arguendo that his failure to develop the factual basis for each of his claims in state court was through no fault of his, he would not be entitled to an evidentiary hearing in this court because he has not made out a prima facie or colorable claim for relief.  See Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005), cert. denied, 547 U.S. 1159 (2006); see also Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999), cert. denied, 528 U.S. 1092 (2000) (habeas "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence'").  As mentioned in the text, Petitioner only urges that counsel should have had the tests done because favorable results might have been found. Accordingly, his motion for an evidentiary hearing is DENIED.  (Docket # 28.)